Campbell Sales Grp., Inc. v. Niroflex by Jiufeng Furniture, LLC, 2022 NCBC 75

STATE OF NORTH CAROLINA

BRUNSWICK COUNTY

CAMPBELL SALES GROUP,
INC. d/b/a LEATHER ITALIA,
USA,

          Plaintiff,

    v.

NIROFLEX BY JIUFENG
FURNITURE, LLC; HIGH POINT
MARKETING GROUP, INC.;
GENFINE FURNITURE
INDUSTRY, LTD. a/k/a
HUIZHOU JIUFENG SCIENCE
TECHNOLOGY INDUSTRIAL
CO. LTD.; MICHAEL
ELKHATIB; and JOHN THOMAS
MOODY a/k/a QUING CHUN
MU,

          Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 865

**ORDER AND OPINION ON MOTIONS
FOR SUMMARY JUDGMENT AND
RENEWED MOTION TO DISSOLVE
PRELIMINARY INJUNCTION**

THIS MATTER comes before the Court on Defendants Genfine Furniture Industry, Ltd. a/k/a Huizhou Jiufeng Science Technology Industrial Co. Ltd. ("Genfine") and John Thomas Moody a/k/a Quing Chun Mu's Motion for Summary Judgment as to Plaintiff's Claims (ECF No. 126), Defendants Niroflex by Jiufeng Furniture, LLC ("Niroflex"), High Point Marketing Group, Inc., and Michael Elkhatib's Motion for Summary Judgment as to Plaintiff's Claims (ECF No. 127), Genfine's Motion for Summary Judgment as to its Counterclaims (ECF No. 131), and

Defendants' Renewed Motion to Dissolve Preliminary Injunction and Forfeit Bond (ECF No. 134).[1]

THE COURT concludes that the Motions should be GRANTED, in part, and DENIED, in part, as set forth below.

> *Coats + Bennett, PLLC by Gavin B. Parsons, David E. Bennett, and Brandee N. Woolard, for Plaintiff Campbell Sales Group, Inc.*
>
> *Wyatt Early Harris Wheeler LLP by Donavan J. Hylarides, Scott F. Wyatt, and Stanley F. Hammer, for Defendants Niroflex by Jiufeng Furniture, LLC, High Point Marketing Group, Inc., Genfine Furniture Industry, Ltd. a/k/a Huizhou Jiufeng Science Technology Industrial Co. Ltd., Michael Elkhatib, and John Thomas Moody a/k/a Quing Chun Mu.*

Davis, Judge.

## INTRODUCTION

1. This case involves a dispute over the sale of furniture between a China-based manufacturer and a North Carolina-based distributor. The parties' business relationship lasted approximately two years and ended amid acrimony and mutual finger-pointing. In resolving the present Motions, the Court must address a host of legal issues, including the applicability of the statute of frauds, the reasonableness of efforts by a party to protect its trade secrets, the evidence of deception necessary to sustain a claim for unfair and deceptive trade practices, and the circumstances upon which the dissolution of a preliminary injunction is appropriate.

---

[1] These motions are referred to herein collectively as the "Motions."

## FACTUAL AND PROCEDURAL BACKGROUND

2. "The Court does not make findings of fact on motions for summary judgment; rather, the Court summarizes material facts it considers to be uncontested." *McGuire v. Lord Corp.*, 2021 NCBC LEXIS 4, at \*\*1–2 (N.C. Super. Ct. Jan. 19, 2021) (cleaned up).

3. Campbell Sales Group, Inc. d/b/a Leather Italia, USA ("LIU") is the Plaintiff in this action. LIU is a wholesale distributor of leather furniture with its principal office in Brunswick County, North Carolina. (Verif. Am. Compl. ¶¶ 1, 13, ECF No. 40.) LIU's chief executive officer is Michael Campbell. (Verif. Am. Compl. ¶ 14; Campbell Aff. ¶ 2, ECF No. 20 [SEALED], ECF No. 21.2.)

4. Defendant Genfine is a company located in Guangdong Province, China. (Moody Aff. ¶ 3, ECF No. 18.2.) Genfine's majority owner and general manager is John Thomas Moody. (Moody Aff. ¶ 2.)[2]

5. Defendant Niroflex was formed in 2018 when it filed Articles of Organization with the North Carolina Secretary of State's office. (Elkhatib Dep. Ex. 2, ECF No. 129.3.) Niroflex's Articles listed High Point Marketing Group, Inc. (who is also a named Defendant in this action) and Genfine as its members. (Elkhatib Dep. Ex. 2.) High Point Marketing Group, Inc. is owned and operated by Michael Elkhatib, another Defendant in this case. (Elkhatib Aff. ¶ 3, ECF No. 18.1.)

---

[2] Moody also goes by the name Qing Chun Mu, which is occasionally misspelled in the record as "Quing Chun Mu." (Moody Aff. ¶ 2.)

6.     Elkhatib is the sole manager of Niroflex.  (Elkhatib Aff. ¶ 4.)  Elkhatib has testified that Niroflex was formed "for the purpose of being Genfine's marketer and distributor in the United States."  (Elkhatib Aff. ¶ 4.)

7.     Beginning in 2017, Genfine and LIU entered into business together for the distribution of Genfine furniture through LIU.   (Moody Aff. ¶ 5.)  Genfine and LIU's relationship was that of a manufacturer and distributor. Genfine manufactured furniture in China based on orders it received from LIU, who then sold the furniture to North American retailers.  (Campbell Aff. ¶¶ 15, 17.)

8.     During the two-year business relationship between LIU and Genfine, the exchange of furniture shipments between them was evidenced almost exclusively by individual invoices.  The only writing relating to the parties' overall relationship was a one paragraph document executed in 2017 and labeled as a "Payable Agreement."  The Payable Agreement, which was signed by Campbell for LIU and Moody for Genfine, stated as follows:

> To:  Leather Italia, USA.  Mike Campbell (CEO and President)
> From: Genfine Furniture Ind. Ltd.  John Thomas Moody (General Manager)
>
> The details herein defined as "Agreement for payable" and terms agreed upon between Mr John Thomas Moody, General Manger Genfine Furniture Ind. Ltd. And Mr Mike Campbell, CEO and President, Leather Italia USA.
> Pursuant to our mutual agreement between our companies we Genfine Furniture Ind. Ltd. confirm we can accept payable terms as follows from Leather Italia USA.
> Net 30 days terms from physical sailing date with a 0.5 % discount.
> Effective date: Shipments (physical Sailing dates) from 1st November, 2017 until 1st November, 2018 both parties agree to renew and/or discuss option-amendments pursuant to this agreement.

(Payable Agreement, LIU Dep. Ex. 30, ECF No. 133.2.)

9.     Following the execution of the Payable Agreement, Genfine produced numerous pieces of furniture that were shipped to LIU in America and sold by LIU to various customers in the United States over the next two years.  (Campbell Aff. ¶¶ 15, 17.)

10.     A significant portion of the parties' dispute in this lawsuit concerns the issue of whether the entire two-year course of dealing between LIU and Genfine was governed by an exclusivity agreement, by which any furniture model manufactured by Genfine for LIU in the North American market could be sold *only* by LIU.  LIU contends that this agreement (an oral one) existed, whereas Genfine vigorously denies any the existence of any such agreement.[3]

11.     LIU maintains that the parties entered into a binding oral agreement that "products that LIU and Genfine developed would be sold exclusively by [LIU] and Genfine would not sell or offer LIU's models to anyone else."  (Campbell Aff. ¶ 6.) Campbell also testified that Genfine, through Moody, "ha[d] agreed to maintain the confidentiality of [LIU's] customers, customer specific information, customer prices, . . . our prices, and other items[.]"  (Campbell Aff. ¶ 5.)  Campbell admits that these agreements were never reduced to a signed writing and testified that this was due to

---

[3] An initial business venture that the parties first discussed was for LIU to distribute a certain model of furniture manufactured by Genfine called "Mo Sleep."  Although the record is not entirely clear on this point, it appears that Genfine concedes the existence of an oral agreement providing that LIU would be the exclusive distributor of Mo Sleep for Genfine. (LIU Dep. 53:4–20, ECF No. 130.1 [SEALED], ECF No. 129.1.)  However, that particular exclusivity agreement was limited to the Mo Sleep model. (LIU Dep. 54:13–16, ECF No. 130.1 [SEALED], ECF No. 129.1.)  The parties' present dispute does not involve Mo Sleep furniture.

the fact that "[t]he relationship between LIU and Genfine was built on trust, verbal agreements and purchase orders." (Campbell Aff. ¶ 5.)

12. Moody, conversely, testified that "[LIU] and Genfine never had an agreement that [LIU] would be Genfine's exclusive furniture distributor in the United States or anywhere else." (Moody Aff. ¶ 9.)

13. Conflict between the parties surrounding the scope of their business relationship appears to have first arisen in 2018, when Joy Wang, a Genfine employee, alerted Marshall Evans of LIU that a particular Genfine model requested by LIU for North American distribution was "unavailable" because of an agreement between Genfine and an unnamed American customer who would not allow this model to be sold to another American customer (such as LIU). (Evans Aff. ¶ 21, ECF No. 31 [SEALED], ECF No. 39; Evans Aff. Ex. 4, at 4, ECF No. 32.2.) This disclosure prompted Evans to take the position in various emails to Wang that LIU's practice was to *only* enter into agreements with business partners pursuant to an agreement ensuring exclusivity in LIU's market. (Evans Aff. Ex. 4, at 3.) In her reply, Wang stated that Genfine was "neither selling [LIU's] design/model to [its] competitors nor working with [LIU] on cheating." (Evans Aff. Ex. 4, at 2.) Wang offered to "try our best to develop a better model for [LIU] in the future." (Evans Aff. Ex. 4, at 2.)

14. Despite this incident, the parties continued their relationship. Things came to a head, however, at the High Point Furniture Market in April 2019 based on LIU's discovery of facts leading it to believe that its models were improperly being sold by Niroflex—who LIU viewed as a competitor. At the Furniture Market, Niroflex

(through Elkhatib) maintained a showroom in which it displayed certain furniture models that Campbell considered to be "LIU's products." (Campbell Aff. ¶ 21.) Elkhatib, when confronted by Campbell as to why LIU's models were being shown in Niroflex's showroom, professed surprise that Niroflex was selling the same models that LIU had been selling. (Elkhatib Dep. 81:11–24, ECF No. 151.2.)

15. At the Furniture Market, Campbell also confronted Moody and asked him why "our products" were being shown at the Niroflex showroom. (Campbell Aff. ¶ 21.) Moody claimed not to know why. (Campbell Aff. ¶ 21.) Campbell showed Moody a business card for Niroflex (that Campbell had apparently obtained from the Niroflex showroom) listing an address for Niroflex that was identical to Genfine's address. Nevertheless, Moody "denied any affiliation between himself, Genfine, and Niroflex." (Campbell Aff. ¶ 21.)[4]

16. On 15 April 2019, Moody admitted to Campbell in an email that he had offered the same models to Niroflex that he had offered to LIU. (Campbell Aff. Ex. 1.)

17. The role of Niroflex in the dispute between LIU and Genfine in this case is significant. The record contains a number of communications between Moody and Elkhatib between 2018 and 2019. (WeChat Messages Between Moody and Elkhatib ["Moody-Elkhatib WeChat"], ECF No. 151.3 [SEALED], ECF No. 166.1.)[5]

---

[4] As noted earlier, the filing documents for Niroflex with the North Carolina Secretary of State's office shows that Genfine was, in fact, one of the two members of Niroflex.

[5] WeChat is an instant messaging application that was often used in this case for communications between the parties' various employees and representatives.

18. During these communications, Moody and Elkhatib discussed LIU on several occasions. For example, at one point in 2018, Elkhatib requested that Moody send him "the price list and also the models you [are] selling [to LIU]." (Moody-Elkhatib WeChat 020695.) Moody agreed to do so. (Moody-Elkhatib WeChat 020695.) Moody also sent Elkhatib other information about LIU's sales volume and customers throughout 2018 and 2019. (Moody-Elkhatib WeChat 020986, 020946, 020952, 021045.)

19. Moody and Elkhatib were also in communication during the Furniture Market in 2019. However, Moody directed Elkhatib (in advance of the Furniture Market) as follows: "At this moment, dont [sic] mention me or China Story, stay low lit." (Moody-Elkhatib WeChat 020986.)

20. After the Furniture Market, Moody attempted to repair the relationship between LIU and Genfine. Moody stated to Campbell via email: "I am sorry for having offered some same models to different customers, which is totally out of my expectations." (Second Elkhatib Aff. Ex. B., ECF No. 36.) Moody sent an additional email, however, expressing concern that LIU was "hold[ing] payment." (Second Elkhatib Aff. Ex. B.) This reference to "holding payment" concerned a "large outstanding debt" owed by LIU to Genfine regarding furniture ordered by LIU from Genfine for which Genfine had never been paid. (Second Elkhatib Aff. ¶ 7, ECF No. 36.) Campbell testified that he had not paid for a particular order of furniture from Genfine because of the incident at the High Point Furniture Market. Campbell stated that "once this unfortunate event occurred, we weren't going to just continue in our

normal course of business, either, knowing that we had been harmed." (LIU Dep. 181:12–15, ECF No. 130.1 [SEALED], ECF No. 129.1.)

21. On 29 April 2019, LIU instituted the present action by filing a verified Complaint in Brunswick County Superior Court asserting various claims for relief against Genfine, Niroflex, High Point Marketing Group, Elkhatib, and Moody. (Verif. Compl., ECF No. 3.)

22. LIU filed an Amended Complaint on 21 June 2019 against those same Defendants in which it alleged the following claims for relief: breach of contract against Genfine and Moody; misappropriation of trade secrets against all Defendants; unfair and deceptive trade practices ("UDTP") against all Defendants; civil conspiracy against all Defendants; breach of confidence against all Defendants; unjust enrichment against all Defendants; conversion against Genfine; and piercing of the corporate veil as to Niroflex. In addition to seeking monetary damages, LIU also sought injunctive relief. (Verif. Am. Compl. ¶¶ 76–169.)

23. On 24 July 2019, Genfine filed an Answer along with Counterclaims against LIU for (1) breach of contract; and (2) wrongful rejection and revocation of acceptance or repudiation. (ECF No. 59.)

24. This case was designated a mandatory complex business case on 29 April 2019 and assigned to the Honorable Gregory P. McGuire. (ECF Nos. 1, 2.)

25. On 3 May 2019, LIU moved for a temporary restraining order ("TRO") preventing Defendants from "[s]elling or offering for sale any product in Plaintiff's HAMPTON, RANDALL, AND RIO lines" and from "[h]aving any contact with any of

Plaintiff's customers in the United States" or "[m]aking any use of any of Plaintiff's trade secrets[.]" (ECF No. 11, at 12–13.) The motion was subsequently treated by the Court as a motion for a preliminary injunction. (Order Mot. Prelim. Inj., at 1, ECF No. 41 [SEALED], ECF No. 42.)

26. On 1 July 2019, the Court entered a preliminary injunction enjoining the sale, or offer of sale, by Defendants of various lines of furniture identified by the use of product names and product identification numbers. (Order Mot. Prelim. Inj., at 22.) In connection with the issuance of the preliminary injunction, the Court set a bond in the amount of $100,000. (Order Mot. Prelim. Inj., at 24.)

27. Defendants filed a Motion to Dissolve the Preliminary Injunction and Forfeit Bond on 30 June 2020. (ECF No. 102.) On 19 August 2020, the Court entered an order denying the motion. (ECF No. 109.)

28. This matter was reassigned to the undersigned on 1 July 2021. (ECF No. 110.)

29. On 18 January 2022, Defendants filed a motion for summary judgment as to all of LIU's claims pursuant to Rule 56 of the North Carolina Rules of Civil Procedure. (ECF Nos. 126, 127.) In addition, Genfine moved for summary judgment on its counterclaims. (ECF No. 131.) Finally, Defendants also filed a Renewed Motion to Dissolve Preliminary Injunction. (ECF No. 134.)

30. The Court held a hearing in this matter on 22 July 2022. The Motions are now ripe for resolution.

## LEGAL STANDARD

31.     It is well established that "[s]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680 (2018) (quoting N.C. R. Civ. P. 56(c)). "[A] genuine issue is one which can be maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534 (1971). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187 (2019) (citation and internal quotation marks omitted).

32.     On a motion for summary judgment, "[t]he evidence must be considered 'in a light most favorable to the non-moving party.'" *McCutchen v. McCutchen*, 360 N.C. 280, 286 (2006) (quoting *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470 (2004)). "[T]he party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact." *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491 (1985) (citation omitted).

33.     The party moving for summary judgment may satisfy its burden by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (citations

omitted).  "If the moving party satisfies its burden of proof, then the burden shifts to the non-moving party to 'set forth specific facts showing that there is a genuine issue for trial.' "  *Lowe v. Bradford*, 305 N.C. 366, 369–70 (1982) (quoting N.C. R. Civ. P. 56(e)).  If the nonmoving party does not satisfy its burden, then "summary judgment, if appropriate, shall be entered against [the nonmovant]."  *United Cmty. Bank (Ga.) v. Wolfe*, 369 N.C. 555, 558 (2017) (quoting N.C. R. Civ. P. 56(e)).

## ANALYSIS

34.     As noted above, there are three motions presently before the Court.  The Court will address each in turn.

### I.     Summary Judgment as to LIU's Claims

35.     Defendants seek the entry of summary judgment on all of the claims asserted by LIU in the Amended Complaint, each of which is analyzed below.

### A.  Breach of Contract

36.     The Court will first address LIU's breach of contract claim as it involves a central area of dispute between the parties.

37.     "The elements of a breach of contract claim are '(1) existence of a valid contract and (2) breach of the terms of that contract.' "  *Syndicated Servs. v. Yarbrough*, 2017 NCBC LEXIS 13, at *13 (N.C. Super. Ct. Feb. 15, 2017) (quoting *Poor v. Hill*, 138 N.C. App. 19, 26 (2000)).

38.     LIU's breach of contract claim is based upon the alleged oral exclusivity agreement entered into between it and Genfine.  In this claim, LIU contends that Genfine breached the exclusivity agreement by selling LIU's furniture models to

other companies in North America, including Niroflex. Defendants seek summary judgment on this claim based on their contention that even if an oral agreement regarding exclusivity was reached between LIU and Genfine (which Defendants deny), such an agreement is unenforceable under North Carolina law based on the statute of frauds.

39. In response, LIU makes two arguments. First, it contends that the various written communications exchanged between the parties are sufficient to constitute "writings" for purposes of the statute of frauds. Second, in the alternative, LIU asserts that the "specially manufactured goods" exception to the statute of frauds applies so as to excuse the absence of such a writing.

40. One of the few things the parties agree on in this case is that their contractual claims and counterclaims are governed by North Carolina's Uniform Commercial Code ("UCC"). The UCC states, in pertinent part, as follows:

> Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars ($500.00) or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

N.C.G.S. § 25-2-201(1) (2021).

41. LIU concedes that the purported exclusivity agreement is properly treated as a contract for the sale of goods for the price of $500 or more. However, its initial contention in response to Genfine's statute of frauds argument is that despite the lack of an initial written exclusivity agreement between the parties, the

subsequent written communications between the parties satisfy the writing requirement for purposes of the statute of frauds. However, the Court disagrees.

42. The Court has conducted a thorough examination of the numerous communications contained in the record between representatives of Genfine and LIU but is unable to identify the existence of any writing that constitutes a sufficiently clear acknowledgement by Genfine of the existence of such an exclusivity agreement (or what the precise terms of such an agreement would have been). Although—as discussed later in this opinion with regard to LIU's UDTP claim—several of Genfine's messages could be construed by a jury as deceiving LIU by falsely denying that Genfine was selling LIU's models to LIU's competitors, those messages are not legally sufficient to satisfy the statute of frauds as writings establishing that a binding exclusivity agreement had previously been entered into between the parties.

43. The writing requirement embedded in the statute of frauds is intended to ensure certainty as to the terms of an agreement between contracting parties. Conversely, the messages here contain no such concrete contractual terms and cannot—without more—satisfy the statute of frauds as to the existence of a legally binding exclusivity agreement entered into between Genfine and LIU.

44. The Court finds our Supreme Court's decision in *Frances Hosiery Mills, Inc. v. Burlington Indus, Inc.*, 285 N.C. 344 (1974), to be easily distinguishable. In *Frances Hosiery*, a clothing manufacturer sued a yarn supplier for breaches of the warranties of merchantability and fitness for a particular purpose. *Id.* at 346. On appeal, the central issue was whether there was a binding contract between the

parties despite the absence of a written contract. *Id.* at 355. The plaintiff argued that although the initial contract between the parties was oral, the statute of frauds was nevertheless satisfied by certain invoices prepared afterwards that were "sufficient to indicate that a contract for sale was made between the parties." *Id.* at 348, 355 (cleaned up). The Supreme Court agreed, concluding that these invoices constituted a "written confirmation" of a prior oral contract such that the statute of frauds did not render the agreement unenforceable. *Id.* at 355. Here, conversely, the messages between LIU and Genfine cannot be so categorized.

45.     The Court notes that the present action is much more analogous to *Orteck Int'l, Inc. v. Transpacific Tire & Wheel, Inc.*, 704 F. Supp. 2d 499 (D. Md. 2010), a federal decision from Maryland.[6] In *Orteck*, an American tire distributor sued a Chinese tire manufacturer based upon the manufacturer's alleged breach of an oral agreement that the American company would have exclusive distribution rights for multiple brands of the manufacturer's tires. *Id.* at 503, 510–11. However, the agreement had not been reduced to a single writing. *Id.* at 510–11. The distributor argued that various emails between the parties allegedly showing the existence of such an agreement were sufficient to satisfy Maryland's statute of frauds. *Id.* at 511. After reviewing the communications between the parties, the *Orteck* court concluded

---

[6] Federal decisions are not binding on North Carolina courts on issues of state law. Nevertheless, our courts are permitted to consider federal decisions to the extent they are instructive. *Sykes v. Health Network Sols., Inc.*, 2013 NCBC LEXIS 50, at **19 (N.C. Super. Ct. Nov. 25, 2013) (citing *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 655 (1973)) ("This court is not bound by federal precedent but may examine federal decisions in search of potentially persuasive authority."); *see also Brown v. Centex Homes*, 171 N.C. App. 741, 744 (2005) (citations omitted) ("Although we are not bound by federal case law, we may find their analysis and holdings persuasive.").

that the emails were insufficiently specific to comply with the statute of frauds. *Id.* at 513. The court ruled that "[o]verall, the emails Plaintiffs have produced show that a non-exclusive supplier-customer relationship existed between the parties, but they do not satisfy the Statute of Frauds to show that Defendants gave Orteck any enforceable exclusive distribution rights for Kaiyuan or Primewell tires." *Id.*

46. LIU's alternative argument is that the alleged exclusivity agreement falls within one of the statutorily enumerated exceptions to the statute of frauds. Specifically, LIU attempts to rely on N.C.G.S. § 25-2-201(3)(a), which provides that an oral contract otherwise subject to the writing requirement may still be valid

> if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement[.]

N.C.G.S. § 25-2-201(3)(a) (2021).

47. Thus, the "specially manufactured goods" exception has two requirements that are appliable here: (1) the goods must "be specially manufactured for the buyer" and (2) they "are not suitable for sale to others in the ordinary course of the seller's business[.]" *Id.*

48. LIU argues that all of the furniture models at issue were selected by LIU and manufactured exclusively for it by Genfine. According to LIU, it would select products from catalogs that it wanted to distribute in the North American market as an exclusive distributor and notify Genfine accordingly. In addition, LIU contends that this furniture was not able to be sold in Genfine's ordinary course of business to

other buyers because the pieces of furniture at issue contained LIU's unique markings.

49. The Court concludes that LIU has failed to raise a genuine issue of material fact as to the applicability of the second prong of the "specially manufactured goods" exception. To the contrary, the record shows that Genfine was—and still is—both eager and able to sell this furniture to buyers other than LIU.

50. Indeed, the Court observes that LIU's argument on this issue is undercut by the fact that LIU sought, and obtained, in this lawsuit a preliminary injunction for the very purpose of *preventing* Genfine from selling furniture allegedly subject to the exclusivity agreement to other customers in the North American market. Logically, if Genfine were incapable of selling the furniture at issue on the open market, LIU would have had no need for a preliminary injunction.

51. Moreover, in the order granting the preliminary injunction, Judge McGuire explicitly recognized the ability of this furniture to be sold to other customers:

> Defendants have requested that they be allowed to remove all [LIU] tags and markings from the Abandoned Products and sell the Abandoned Products to mitigate part of their losses. (ECF No. 35, at pp. 9–10.) As set out in the injunctive order below, the Court will permit Defendants to sell the Abandoned Products, after removal of all [LIU] tags and markings, in markets other than the North American market.

(Order Mot. Prelim Inj. ¶ 45.)

52. Therefore, the Court GRANTS Defendants' Motion for Summary Judgment on Plaintiff's breach of contract claim.

**B. Misappropriation of Trade Secrets**

53. Defendants have also moved for summary judgment on Plaintiff's claim for misappropriation of trade secrets. In this claim, LIU contends that Genfine possessed information that was considered confidential by LIU and—through Niroflex—improperly used this information in order to gain a competitive advantage in the United States market. The Court concludes that summary judgment is appropriate on this claim as well.

54. "A threshold question in any action involving allegations of misappropriation of trade secrets is whether the information in question constitutes a trade secret under the Trade Secret Protection Act ["TSPA"] . . . ." *Koch Measurement Devices, Inc. v. Armke*, 2015 NCBC LEXIS 45, at *10 (N.C. Super. Ct. May 1, 2015) (quoting *Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 369, (2001)).

55. Under the TSPA,

"Trade secret" means business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152 (2021).

56. Our courts have identified six factors considered in determining whether information alleged falls within the definition of a trade secret under the TSPA:

(1) the extent to which the information is known outside the business;

(2) the extent to which it is known to employees and others involved in the business;

(3) the extent of measures taken to guard the secrecy of the information;

(4) the value of [the] information to [the] business and its competitors;

(5) the amount of effort or money expended in developing the information; and

(6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Combs*, 147 N.C. App. at 369–70 (citations omitted).

57. The alleged trade secrets that LIU claims were misappropriated essentially include its sales information, customer preferences, sales volume information and inventory, and the identity of salespersons who understand the volume of furniture ordered by LIU's customers.

58. Defendants argue that (1) the types of information identified by LIU do not actually qualify as trade secrets under North Carolina law; and (2) even if they did so qualify, this information was not subject to any reasonable measures to protect its status as a trade secret.

59. Based on a careful and thorough review of the record, the Court concludes that even assuming *arguendo* that LIU has satisfied its burden at the summary judgment stage of showing that the types of information at issue could

potentially qualify as trade secrets, it has failed to show a genuine issue of material fact on the issue of whether LIU took reasonable measures to protect this information.

60. It is well established that "[n]o trade secret will be found if . . . there is no evidence indicating that the plaintiff undertook efforts to ensure the information's secrecy." *Safety Test & Equip. Co. v. Am. Safety. Util. Corp.*, 2015 NCBC LEXIS 40, at \*26 (N.C. Super. Ct. Apr. 23, 2015) (citing *Bank Travel Bank v. McCoy*, 802 F. Supp. 1358, 1360 (E.D.N.C. 1992)).

61. Although the reasonableness of measures taken to protect the confidentiality of information claimed to be a trade secret is often appropriate for resolution by a jury, the absence of evidence of such measures can result in the dismissal of the claim as a matter of law. The Court is guided in its analysis by our Supreme Court's decision in *Krawiec v. Manly*, 370 N.C. 602 (2018).

62. In *Krawiec*, the owners of a dance company sued two former instructors and their new employer based on the alleged violation of a contract that the instructors had entered into with the plaintiffs' company. *Id.* at 605. The plaintiffs alleged that upon switching jobs the instructors had shared confidential information about the plaintiffs' company relating to production, marketing, and customer information. *Id.* The Supreme Court affirmed the trial court's dismissal of the claim, concluding, in part, that the complaint did not sufficiently identify the information allegedly subject to trade secret protection. *Id.* at 611–12.

63.     Additionally, the Supreme Court held that the complaint also failed to identify any reasonable measures taken to maintain the secrecy of such information. *Id.* at 612. The Supreme Court noted that "the only allegation of secrecy in plaintiffs' amended complaint is that 'Plaintiffs shared this information with [defendants] in confidence.' " *Id.* The Supreme Court ruled that this "expectation of confidentiality" was insufficient to satisfy the "reasonable measures" prong of a misappropriation claim. *Id.*

64.     This Court reached a similar result at the summary judgment stage in *Edgewater Servs. v. Epic Logistics, Inc.*, 2009 NCBC LEXIS 21 (N.C. Super. Ct. Aug. 11, 2009), *aff'd*, 217 N.C. App. 399 (2011), and *Vitaform, Inc. v. Aeroflow, Inc.,* 2022 NCBC LEXIS 128 (N.C. Super. Ct. Oct. 27, 2022).

65.     In *Edgewater*, during the course of leaving the plaintiff company's employment, the defendant allegedly removed certain confidential materials. *Edgewater*, 2009 NCBC LEXIS 21, at **7–8. The plaintiff described these materials as "customer lists, pricing information and carrier lists[.]" *Id.* In granting summary judgment for the defendant on the plaintiff's misappropriation claim, this Court held that such information did not constitute a trade secret, particularly in light of the plaintiff's failure to describe any measures used to keep the materials confidential. *Id.* at **9–14. We noted that "when a customer [became] aware of [the plaintiff's] rate schedule, the customer [was] not required to sign anything agreeing to keep that information confidential." *Id.* at **12. This Court also found significant the fact that carrier files and rate information were kept "in an unlocked room, accessible to

anyone" and not in "any locked containers," meaning that "anyone could access the information in the carrier files and rates files 'if they knew what they were looking for.'" *Id*. at **12–13. We concluded that "[the plaintiff] did not have sufficient safeguards, protocols, or procedures in place to protect the secrecy of such information from persons outside [the plaintiff company] or within [the plaintiff company]." *Id*. at **14.

66. In *Vitaform*, this Court recently found a similar failure by the plaintiff to protect its alleged trade secrets where the plaintiff

> fail[ed] to provide any evidence that it obtained oral or written non-disclosure agreements to protect the confidentiality of its alleged trade secrets from its employees, the medical practice it worked with . . . , the insurance companies to which [plaintiff] disclosed its . . . codes, the physicians who provided [plaintiff] with the scientific studies for its white papers, the . . . distributors to which [plaintiff] pitched its products, or the roughly thirty other . . . distributors that had been selling [plaintiff's] products since at least 2013.

*Vitaform*, 2022 NCBC LEXIS 128, at **25.

67. We concluded that the plaintiff had failed to forecast sufficient evidence of reasonable measures under the TSPA given that it "did *not* require all parties to maintain the confidentiality of its business process," which "demonstrates [plaintiff's] inconsistent efforts at ensuring the secrecy of its alleged trade secret." *Id*. at **25–26.

68. In the present case, the Court likewise finds that the minimal efforts taken by LIU to protect the secrecy of the information at issue do not constitute "sufficient safeguards, protocols, or procedures in place to protect the secrecy" of said information. *See Edgewater*, 2009 NCBC LEXIS 21, at **14.

69.     LIU has failed to point to any evidence of measures it took to protect its alleged trade secrets that would raise a triable issue on its claim under the TSPA.  It is undisputed that LIU did not have any confidentiality agreements with its own employees in North Carolina.  (LIU Dep. 76:3–16, ECF No. 130.1 [SEALED], ECF No. 129.1.)  Nor did it require its agent in China, Rhoda Zheng, to sign such an agreement.   (LIU Dep. 199:14–16, ECF No. 130.1 [SEALED], ECF No. 129.1.) Campbell testified that LIU did enter into written agreements with its sales representatives that contained confidentiality provisions, but these appear to be the only written confidentiality agreements implemented by LIU before the filing of this lawsuit.  (LIU Dep. 69:20–74:15, ECF No. 130.1 [SEALED], ECF No. 129.1.)

70.     Although LIU has offered testimony suggesting that Campbell sought an agreement on confidentiality from Moody and Genfine, no such agreement was ever reduced to writing, and LIU has failed to produce evidence of a meeting of the minds between the parties on specific terms of confidentiality.  At most, LIU has shown evidence of inconsistent, haphazard protection of its alleged trade secrets— like the sporadic efforts to preserve confidentiality in *Vitaform*—that simply does not constitute the taking of reasonable measures to protect LIU's confidential information.

71.     Therefore, the Court GRANTS summary judgment in Defendants' favor on LIU's misappropriation of trade secrets claim.

**C. Breach of Confidence**

72.     LIU has also attempted to assert a common law claim for "breach of confidence," which appears to be based on the same theory as the misappropriation of trade secrets claim the Court has found to be legally deficient.

73.     Moreover, LIU has failed to cite any case law from North Carolina's appellate courts that has recognized a standalone claim for breach of confidence.

74.     Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment as to LIU's claim for breach of confidence.

**D. Unjust Enrichment**

75.     Defendants also seek summary judgment as to LIU's claim for unjust enrichment.

76.     Our Supreme Court has stated that

> [a] claim for unjust enrichment "is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988). "The claim is not based on a promise but is imposed by law to prevent an unjust enrichment." *Id.* at 570, 369 S.E.2d at 556. "In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party," and "[t]he benefit must not be gratuitous and it must be measurable." *Id.* at 570, 369 S.E.2d at 556 (citing *Britt v. Britt*, 320 N.C. 573, 359 S.E.2d 467 (1987)).

*Krawiec*, 370 N.C. at 615.

77.     Defendants argue that LIU has failed to demonstrate that they ever received an actual benefit from LIU that would suffice to form the basis for an unjust enrichment claim.  The Court agrees.

78. Although LIU contends that it conferred upon Genfine the opportunity for new business relationships, such an assertion is too nebulous and does not involve the type of measurable benefit that our courts have previously recognized as sufficient to support an unjust enrichment claim. *Id.* ("In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party, and the benefit must not be gratuitous and it must be measurable.") (cleaned up); *BDM Invs. v. Lenhil, Inc.*, 2014 NCBC LEXIS 6, at **40–41 (N.C. Super. Ct. Mar. 20, 2014) ("Unjust enrichment occurs when a measurable benefit was conferred on the defendant . . . .") (cleaned up).

79. Thus, because the type of benefit upon which LIU attempts to rely in support of this claim is legally insufficient, the Court GRANTS Defendants' Motion for Summary Judgment as to LIU's claim for unjust enrichment.

**E. Conversion**

80. LIU's claim for conversion concerns one specific shipment of furniture that is referred to by the parties as the "Art Van Shipment." LIU asserts that Genfine has wrongfully refused to allow the Art Van Shipment to be released to LIU despite the fact that LIU has already paid for the furniture contained therein.

81. The record reveals that on 20 May 2019, LIU sent an email in which it confirmed that it had wired $14,249.75 to Genfine in order to pay for the Art Van Shipment, which it had previously ordered. (Art Van Emails, at 1, ECF No. 151.5.) LIU demanded that Genfine provide a "Telex release" that would allow the Art Van Shipment to be "released and delivered to port in the US[.]" (Art Van Emails, at 1.)

LIU contends that Genfine accepted the $14,249.75 but has not taken the necessary steps that would allow the furniture to actually be released to LIU. Thus, according to LIU, it has fulfilled all of its obligations under the purchase order for the Art Van Shipment by wiring $14,249.75 but that Genfine has nevertheless refused to either return the funds or release the furniture.

82. "[T]he tort of conversion is well defined as an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012) (cleaned up). Thus, "[t]here are, in effect, two essential elements of a conversion claim: ownership in the plaintiff and wrongful possession or conversion by the defendant." *Id.* (cleaned up).

83. At the 22 July hearing on the pending Motions, counsel for Defendants conceded that although LIU has paid for the Art Van shipment, Genfine never directed that the furniture be released to LIU.

84. The Court observes that on these facts it may have been more appropriate for this claim to have been brought as one for breach of contract rather than conversion. Nevertheless, the Court is unable to say as a matter of law based on the present record that these facts cannot also potentially give rise to a valid conversion claim.

85. Therefore, the Court DENIES Defendants' Motion for Summary Judgment as to LIU's claim for conversion.

**F. UDTP**

86.     The Court likewise concludes that summary judgment is inappropriate as to LIU's claim for UDTP.

87.     LIU's UDTP claim is based—in a nutshell—on its allegations that Defendants engaged in a pattern of deception designed to damage LIU's business and diminish LIU's standing in the furniture industry to the benefit of Niroflex, who was not only a competitor of LIU but also an entity partly owned by Genfine itself.

88.     In their briefs, Defendants argue that if the Court enters summary judgment in their favor on LIU's claims for breach of contract (based on the alleged exclusivity agreement) and for misappropriation of trade secrets—both of which the Court has done in this opinion—then no remaining basis exists for LIU's UDTP claim to proceed.  The Court is unable to agree.

89.     This Court has previously stated the following with regard to UDTP claims:

> North Carolina law created a private right of action under Chapter 75 as part of its effort to protect consumers from unfair or deceptive trade practices.  *See* N.C.G.S. § 75-1.1 (outlawing unfair or deceptive practices in trade); N.G.G.S. § 75-16 (creating a private right of action and authorizing treble damages); *see also Hardy v. Toler*, 24 N.C. App. 625, 630-31, 211 S.E.2d 809, 813 (1975).  The protections of N.C.G.S. § 75-1.1 extend, in certain circumstances, to businesses as well.  *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 710 (2001) (citing *United Labs.*, 322 N.C. at 665, 370 S.E.2d at 389).

> "[T]o establish a prima facie claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff."  *Dalton*, 353 N.C. at 656, 548 S.E.2d at 711 (citing *Spartan Leasing, Inc. v. Pollard*, 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991)).  "The Act does not . . .

define an unfair or deceptive act, 'nor is any precise definition of the term possible.' " *Bernard v. Cent. Carolina Truck Sales, Inc.*, 68 N.C. App. 228, 229-30, 314 S.E.2d 582, 584 (1984) (quoting *Wachovia Bank & Trust Co. v. Smith*, 44 N.C. App. 685, 690, 262 S.E.2d 646, 649 (1980)). A trade practice "is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 174 N.C. App. 49, 59, 620 S.E.2d 222, 230 (2005) (citing *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987)).

*Charah, LLC v. Sequoia Servs., LLC*, 2020 NCBC LEXIS 52, at *18 (N.C. Super. Ct. Apr. 17, 2020).

90.     Whether the alleged conduct constitutes an unfair or deceptive act is "a question of law for the court." *Dealers Supply Co. v. Cheil Indus.*, 348 F. Supp. 2d 579, 592 (M.D.N.C. 2004) (citing *Gray v. North Carolina Ins. Underwriting Ass'n, NC*, 352 N.C. 61, 68 (2000)). The question of "[w]hether a particular act is unfair or deceptive, depends on the facts surrounding the transaction and the impact on the marketplace." *Dealers Supply*, 348 F. Supp. 2d at 591 (citing *Concrete Serv. Corp. v. Invs. Group, Inc.*, 79 N.C. App. 678, 685 (1986)).  However, "[n]either the statutory language itself nor North Carolina caselaw requires proof of any contractual relationship between the parties." *Dealers Supply*, 348 F. Supp. 2d at 591–92 (citing *Prince v. Wright*, 141 N.C. App. 262, 268 (2000)).

91.     To the extent that Defendants are contending that the ability of LIU's UDTP claim to survive summary judgment necessarily rises or falls based on whether LIU's other substantive claims are allowed to go forward, that is not an accurate statement of North Carolina law.  As this Court has previously stated,

Chapter 75 "creates a cause of action broader than traditional common law actions[.]" *Bernard*, 68 N.C. App. at 232, 314 S.E.2d at 585 (quoting

*Marshall v. Miller*, 302 N.C. 539, 547, 276 S.E.2d 397, 402 (1981)). "Although certain [causes of action], standing alone, may evoke the action, a claim for unfair and deceptive trade practices pursuant to N.C.G.S. § 75-1.1 is an independent claim that stands alone as a distinct action[.]" *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 2003 NCBC LEXIS 6, at *139 (N.C. Super. Ct. May 2, 2003). Therefore, so long as the complaint includes sufficient factual allegations of potentially unfair or deceptive conduct, the claimant may still maintain a UDTP claim, notwithstanding the dismissal of breach of contract or tort causes of action based on the same conduct.

*Charah,* 2020 NCBC LEXIS 52, at *19–20.

92. In the present case, LIU has put forth evidence of a number of allegedly deceptive statements and acts by Defendants that occurred during the course of the business relationship between LIU and Genfine.

93. The evidence presently before the Court—when viewed in the light most favorable to LIU as the non-moving party—suggests that (1) LIU was operating on the assumption that the models Genfine was manufacturing for it were to be sold exclusively by LIU in the North American market; (2) Genfine falsely assured LIU that it was operating under this same understanding; and (3) in reality, Genfine was not only selling LIU's models to other customers in this market but was also conspiring with Niroflex, a Genfine-affiliated distributor competing against LIU, to cause financial harm to LIU.[7]

---

[7] As discussed in detail above, no legally binding exclusivity agreement actually existed between LIU and Genfine, meaning that there was no contractual prohibition against Genfine selling the models of furniture at issue to other customers besides LIU. However, if LIU is able to prove at trial that (1) Genfine falsely assured LIU that Genfine *was*, in fact, affording it exclusivity when, in reality, Genfine was selling those same models to Niroflex and other competitors of LIU; (2) LIU relied on those representations in continuing to do business with Genfine; and (3) Genfine's deception proximately caused harm to LIU, then Defendants can potentially be liable for UDTP.

94. This narrative of deception is supported by a number of messages that were exchanged between the parties' representatives, which are contained in the record.[8] For example, on 4 May 2018 Marshall Evans complained to Joy Wang of Genfine that an LIU design had been sold to one of LIU's competitors in the United States.

95. Wang replied, "Sorry this is our fault, please let me kindly explain how was the case [sic] going." (Evans Aff. Ex. 4, at 2.)

96. Wang further stated:

> We [Genfine] are neither selling your [LIU's] design / model to your competitors nor working with you on cheating, and contrarily, we would like to afford you our best products, that's why we made the above fault from the beginning [sic]. We feel so sorry and appologize [sic] for our above immature action to bring you so much unconvenience [sic]. Thank you very much to give up this model to make the things become simple, we would like to try our best to todevelop [sic] a better model for you in the future.

(Evans Aff. Ex. 4, at 2.)

97. LIU has also offered evidence supporting the proposition that despite Wang's apology and assurances, Genfine's deception continued, culminating in the breakdown of the parties' relationship in the aftermath of the 2019 High Point Furniture Market. The following WeChat messages exchanged between Evans and Moody during April 2019 are illustrative:

> **Evans**: We need your help with Rio! Multiple major accounts cancel their orders today due to cost. Competition has exact same model/leather for much less.

---

[8] A number of these messages are admittedly ambiguous, and Defendants ask the Court to construe them simply as efforts by Genfine to pacify a difficult customer (LIU). But under Rule 56 the Court must construe them in the light most favorable to LIU as the non-moving party.

What's the name of the agent in China you ship 3 sets to Rio too [sic] before CNY [Chinese New Year]?

**Moody**: It's a trading company called national furniture Sourcing which I know is middleeast background

**Evans**: it appears you sold to an agent that is in high point, selling the rio, undercutting our cost

Did the agent get a better price than us?

**Moody**: Absolutely not the [p]rice for you is the [best] I swear!

**Evans**: Our competition's sale price is almost equal to our cost from Genfine… Impossible without better cost
Example of problem: [customer] purchase Rio….. Now they can get it for over $50 savings from our compition [sic]… now they will cancel orders with us. We are losing business… big problem.

**Moody**: Could that be the merchandising reason I know some company merchandise really deep?

**Evans**: No
This is a big problem because we expected to be protected by Genfine on our designs…. You didn't protect us

**Moody**: Let me try to check and get back I swear to god your price is the best we ever made and spare no room at all

**Evans**: Even with the pricing… This model should not be sold to in USA while we get placements / business together on this design
We had multiple top 100 accounts come in to guy [sic] this market ……
They all said no because of cost
*come in to buy this market…..

**Moody**: Sorry if that is the case give me some time let me check and get back I feel confused too.

(WeChat Messages between Evans and Moody ["Moody-Evans WeChat"] 001066–68,

ECF No. 151.4 [SEALED], ECF No. 152.4.)

98. Similarly, in a conversation with Campbell at the Furniture Market, Moody denied knowing why Niroflex was selling LIU's models. (Campbell Aff. ¶ 21.) Specifically, Campbell testified that "[w]hen I asked [Moody], 'Are you offering our designs through another company,' . . . he said, 'No'." (LIU Dep. 240:2–3, ECF No. 151.1 [SEALED], ECF No. 152.1.)

99. Moody also subsequently denied to LIU the existence of any affiliation between Niroflex and Genfine despite the fact that such an affiliation did, in fact, exist. (Moody-Evans WeChat, 1066–70.) Moody told Campbell in an email dated 15 April 2019 that Niroflex was simply a "customer" (and, impliedly, not an affiliated entity). (Campbell Aff. Ex. 1.) In reality, as noted above, Niroflex's filing with the North Carolina Secretary of State's office listed Genfine as one of Niroflex's members. (Elkhatib Dep. Ex. 2.)

100. In a 15 April 2019 email, Moody apologized for his prior actions. The email states, in full, as follows:

Dear Mike,

Hope you are doing great!

I have been back to China and I badly apologize for the High Point issue.

1. Originally I got to know this customer through a friend, they have middle east background, they are trying to develop business in different countries, like S. Africa, Middle east, Brazil, and USA.

2. From the beginning I pretty much doubt their capability especially in USA market (Due to it's such a difficult competitive market), finally they got a chance to have a try, and I have honestly not expected they will make any noise in the market and caused confusion to you.

3. I made a stupid mistake in product offering I undoubtedly should have offered different model / styles to different customers, as if otherwise, it doesn't do me any good either, really really sorry!!!

4. I sincerely ask for your forgiving and hope you can give one more chance, if it's possible I will absolutely protect your models and advoid [sic] conflict.

5. To show faithfulness, I will double check and to see where I can do better in terms of price, I should send you the updated cost today or latest Tomorrow if any!

(Campbell Aff. Ex. 1.)

101. In another email to Campbell dated 23 April 2019, Moody apologized again, stating the following:

Dear Mike, Hope you are doing good!

I have sent you email and also called you, but so far I don't get any feedback from your side or pick up phone!

I understand you are not happy with the current situation, I would like to do some communications with you as follows:

1. For quite a long time, our factory has been short of orders, so we have been trying to develop more customers.

2. I do like to develop more business opportunities in the US and worldwide, but I do not at all want to hurt you, I am sorry for having offered some same models to different customers, which is totally out of my expectation.

3. As we have known, I have especially adjusted our price and offered the best possible price before Apr. 2019 market, as we like to support you to do better and more!
Even more, after the conflict issue, I have again lowered the price of 7160 which is the big seller just to [sic]

4. I understand you are not happy, in the future no matter you choose to keep working together or any other decision, I can understand either way, but considering our past cooperation, can you pls not to [sic] hold

our payment, I need to pay our supplier and finance the later container production.

5. I hope you can make some communication so I know how to cooperate with you!

Thank you Mike and look forward to your reply!

(Second Elkhatib Aff. Ex. B.)

102. LIU has also put forth evidence suggestive of deceptive acts toward LIU by Elkhatib and Niroflex. Although Elkhatib claimed to be surprised during the Furniture Market when Campbell accused Niroflex of selling LIU models, prior to the Furniture Market Moody had warned Elkhatib about the likely presence of LIU representatives there. (Elkhatib Dep. 81:11–24, ECF No. 151.2.)

103. Before the Furniture Market, on 7 April 2019, Moody sent Elkhatib a WeChat communication referencing "info from leather Italia"[9] and advising Elkhatib "[a]t this moment, don't mention me . . . stay low lit." (Moody-Elkhatib WeChat 020986.) The next day, Moody sent a picture of a person (presumably a representative of LIU) to Elkhatib and wrote "leather italia son in law" and warned in a subsequent message, "Be careful if is leather italia guy checking us." (Moody-Elkhatib WeChat 020986.)

104. Other communications are arguably suggestive of a plan between Elkhatib and Moody to effectively undercut LIU's presence in the North American market while, at the same time, Genfine would continue to produce furniture for LIU and hide the fact that it was selling its models to LIU's competitors. For example, on

[9] As noted earlier, LIU was doing business under the name "Leather Italia, USA."

11 January 2018 Elkhatib messaged Moody that "[m]y idea is to start cooperation and planning for long term partnership and success." (Moody-Elkhatib WeChat 020679.) Elkhatib and Moody exchanged LIU sales information in 2018, and on one occasion on 24 February 2018 Moody described a particular model and then stated "leather italia sells a lot[.]" (Moody-Elkhatib WeChat 020699.) In early 2018, Elkhatib requested that Moody send him "the price list and also all the models you selling Leather italia, Robinson and Chris with picture and prices they paying to study and understand how you market our company." Moody agreed to do so. (Moody-Elkhatib WeChat 020695.) Moody again shared sales information from LIU with Elkhatib later in 2018 and also in 2019. (Moody-Elkhatib WeChat 0209046, 020952, 021045.)

105. In sum, viewing the evidence in the light most favorable to LIU, (1) Genfine falsely assured LIU representatives during the period between 2017 and 2019 that Genfine would treat LIU as the exclusive distributor in North America for certain furniture models produced by Genfine; (2) LIU relied on those representations in continuing to do business with Genfine; (3) despite having made those representations, Genfine proceeded to sell those same models to competitors of LIU (including Niroflex—a company allegedly used to diminish LIU's status in the market and as to whom Genfine concealed its ownership interest); and (4) as a result, LIU suffered damages.

106. With regard to those alleged damages, LIU asserts that they stem from the ability of Niroflex to undercut LIU's prices on certain furniture models by using

pricing information LIU had given Genfine in order to reduce the market for these models at LIU's desired pricing level. LIU contends that Niroflex offered these same models at lower prices which, in turn, caused problems between LIU and a number of its customers who were led to believe LIU's prices were artificially high.[10]

107. Defendants, not surprisingly, take issue with LIU's entire characterization of these events. Essentially, Defendants deny that they engaged in any deceptive conduct, contending that the messages in the record between Moody and Campbell relied upon by LIU simply reflected an attempt by Genfine to mollify an unhappy customer and preserve a business relationship. Moreover, Defendants deny that LIU can actually show any injury proximately caused by these events.

108. To be sure, a number of the above-quoted messages between the parties are somewhat cryptic and lend themselves to different interpretations. But it will be the role of the jury at trial to assess the validity of the parties' competing narratives.

109. For these reasons, Defendants' Motion for Summary Judgment on LIU's UDTP claim is DENIED.

**G. Civil Conspiracy**

110. The Court concludes that Defendants are also not entitled to summary judgment on LIU's claim for civil conspiracy.

---

[10] Campbell testified that "Defendants are selling LIU's exact products, using the LIU model number and charging $50 to $100 per piece less in price while not charging the customer the current tariff on Chinese imports." (Campbell Aff. ¶ 18.) He further stated that "LIU's marketing and business plan has been built on being the exclusive source for these models in the United States." (Campbell Aff. ¶ 17.) Additionally, he testified that as a result of Defendants' conduct, LIU lost some customers outright and was forced to sell certain models to other customers at a loss in order to retain their business. (Campbell Aff. ¶¶ 29–30.)

111. We have previously stated that "[c]ivil conspiracy is not an independent cause of action in North Carolina. Rather, liability for civil conspiracy must be alleged in conjunction with an underlying claim for unlawful conduct." *Hart v. First Oak Wealth Mgmt., LLC*, 2022 NCBC LEXIS 81, at **63 (N.C. Super Ct. July 28, 2022) (cleaned up). "To state a claim for civil conspiracy, a plaintiff must allege (1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Id.* at **63–64 (cleaned up).

112. As discussed above, the Court has concluded that LIU's claims for UDTP survives summary judgment and, as a result, the civil conspiracy claim can exist in conjunction with that claim. *See Am. Air Filter Co. v. Price*, 2017 NCBC LEXIS 55, at *32 (N.C. Super. Ct. June 26, 2017) ("Since [Plaintiff's] claims for misappropriation and unfair trade practices survive dismissal, these claims can serve as the requisite underlying torts for a civil conspiracy claim.") (cleaned up).

113. Moreover, LIU has supported its civil conspiracy claim with direct evidence in the form of messages between Moody and Elkhatib. In several of these communications, the two of them appear to be discussing (1) LIU's customer and sales information; and (2) how they can conceal from LIU the relationship between Genfine and Niroflex.

114. The Court agrees with LIU that both the direct evidence it has presented in the form of the above-referenced messages as well as the circumstantial evidence

contained in the record are sufficient to raise a triable issue on LIU's civil conspiracy claim.

115. The Court therefore DENIES Defendants' Motion for Summary Judgment as to LIU's claim for civil conspiracy.

**H. Veil Piercing**

116. Finally, Defendants also move for summary judgment on LIU's request that the Court "pierce the corporate veil" of Niroflex on the theory that Niroflex should be deemed to be a mere instrumentality of Genfine. In support of this request, LIU contends that "[o]ut of fairness and equity, the Court should disregard Niroflex's corporate status." (Verif. Am. Compl. ¶ 161.)

117. As this Court recently stated:

> "The general rule is that in the ordinary course of business, a corporation is treated as distinct from its shareholders." *Green v. Freeman*, 367 N.C. 136, 144-45, 749 S.E.2d 262 (2013) (quoting *State ex rel. Cooper v. Ridgeway Brands Mfg.*, LLC, 362 N.C. 431, 438, 666 S.E.2d 107 (2008)). "Disregarding the corporate form is not to be done lightly [ ] but is reserved only for an extreme case where necessary to serve the ends of justice[.]" *Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2017 NCBC LEXIS 27, at *12 (N.C. Super. Ct. Mar. 27, 2017) (cleaned up).

*Gallaher v. Ciszek*, 2022 NCBC LEXIS 131, at **32–33 (N.C. Super. Ct. Nov. 4, 2022).

118. "Veil piercing is not a theory of liability but a form of relief that provides an avenue to pursue legal claims against those otherwise shielded by the corporate form." *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, 2018 NCBC LEXIS 56, at *23 (N.C. Super Ct. June 5, 2018) (cleaned up). "It is well recognized that courts will . . . 'pierce the corporate veil' . . . whenever necessary to prevent fraud

or to achieve equity." *Glenn v. Wagner*, 313 N.C. 450, 454 (1985). However, our courts have made clear that "a court's decision to pierce the corporate veil . . . is a strong step: Like lightning, it is rare and severe." *Gallaher*, 2022 NCBC LEXIS 131, at **33.

119. In analyzing veil piercing claims, North Carolina courts have utilized the "instrumentality test." *Ridgeway*, 362 N.C. at 441. Under this test, piercing the veil may be appropriate when "the [entity] is the 'mere instrumentality or alter ego' of another entity or individual." *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, 2017 NCBC LEXIS 91, at *10 (N.C. Super Ct. Oct. 3, 2017) (quoting *Estate of Hurst v. Moorehead I, LLC*, 228 N.C. App. 571, 577 (2013)).

120. A plaintiff must satisfy the following three elements under the instrumentality rule:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Insight*, 2018 NCBC LEXIS 56, at *23–24 (cleaned up).

121. In order to determine whether the first factor of the instrumentality test has been met, our courts have emphasized the relevance of the following factors:

   a. Inadequate capitalization ("thin incorporation")
   b. Non-compliance with corporate formalities

c. Complete domination and control of the corporation so that it has no independent identity
d. Excessive fragmentation of a single enterprise into separate corporations

*Id.* at *25 (cleaned up).

122. These factors are not exclusive, however, and "the presence or absence of any particular factor is not dispositive." *Gallaher*, 2022 NCBC LEXIS 131, at **36 (citation omitted). Moreover, "[w]hen a plaintiff seeks to pierce the corporate veil of an LLC, rather than a corporation, these factors may be weighed differently." *Insight*, 2018 NCBC LEXIS 56, at *25 (citation omitted).

123. Based on a careful examination of the record, the Court concludes that the entry of summary judgment in favor of Defendants on this issue is appropriate.

124. The record demonstrates that Elkhatib—not Genfine—controlled Niroflex's day-to-day operations. Elkhatib testified as follows regarding Niroflex's operations:

> Q: In terms of the operations of Niroflex, who -- who makes the day-to-day decisions --
> A: I do.
> Q: -- on running the business?
> A: I do.
> Q: You do? Okay. Are there any types of decisions that you have to consult with someone at Genfine before making?
> A: No.
> Q: Do you handle paying bills for Niroflex?
> A: Yes.
> Q: Do you -- are you the only person with check-writing privileges for Niroflex?
> A: Yes.
> Q: Okay. You just pay whatever bills you need to pay?
> A: Yes.
> Q: Okay. Do you -- does Niroflex have any loans?
> A: No.

Q: Okay. Do you have authority to go and take out loans if you need it for Niroflex?
A: I believe so.
Q: Okay. What kind of -- what kind of input does Genfine have in the day-to-day operations of Niroflex?
A: None.

(Elkhatib Dep. 20:18–21:19, ECF No. 164.)

125. LIU has failed to rebut this testimony with evidence suggesting that Genfine actually possesses complete control over Niroflex or that Niroflex is a legal entity in name only.

126. The Court has carefully considered LIU's arguments on this issue and concludes that LIU has failed to raise a genuine issue of material fact to support its veil piercing claim.

127. The Court therefore GRANTS Defendants' Motion for Summary Judgment as to the issue of veil piercing. *See Stonewall Constr. Servs., LLC v. Frosty Parrott Burlington, LLC*, 2018 N.C. App. LEXIS 1077, at *11 (N.C. Ct. App. Nov. 6, 2018) (affirming the trial court's entry of summary judgment in defendant's favor on a veil piercing claim for failure to satisfy the instrumentality test); *BDM Invs. v. Lenhil, Inc.*, 2014 NCBC LEXIS 32, at **13 (N.C. Super. Ct. July 21, 2014) ("[Plaintiff] has not forecast evidence of such control, and the court must grant summary judgment on [Plaintiff's] veil-piercing claim[.]").

## II. Summary Judgment as to Genfine's Counterclaims

128. Genfine also seeks summary judgment in its own favor on its counterclaims for breach of contract and wrongful rejection and revocation of acceptance or repudiation.[11]

129. Genfine's counterclaims concern two discrete sets of shipments. The first set stems from the period of January to March 2019 and consists of eighteen containers of furniture. These goods (which Defendants refer to as the "Received Goods") were manufactured by Genfine at LIU's request and shipped to LIU (or LIU's customers) but were never paid for by LIU. The amounts of the Received Goods total $355,600.55. (LIU Dep. Ex. 42, ECF No. 133.3.)

130. The second set of shipments that form the basis for Genfine's counterclaims relate to seven containers of furniture shipped to LIU in March and April 2019 (which Defendants refer to as the "Abandoned Goods"). (LIU Dep. Ex. 43, ECF No. 133.4.) Before delivery, however, LIU informed the shipping companies that LIU was abandoning the goods in transit because of a dispute with Genfine. (LIU Dep. 192:2–193:7, ECF No. 133.1.) Genfine has received no compensation for the Abandoned Goods, the price of which amounts to $128,533.80. (LIU Dep. Ex. 43, ECF No. 133.4.)

---

[11] Defendants' counterclaim for "wrongful rejection and revocation of acceptance or repudiation" is properly characterized as an attempt to affirmatively resolve the issue of whether LIU properly rejected the furniture shipments at issue and, therefore, whether LIU is liable for breach of contract. Thus, it is not a separate, actionable claim for relief. Accordingly, the Court will analyze the counterclaims together.

131. In addition, Genfine has provided evidence that $33,174.91 was incurred as incidental damages in the form of "freight and demurrage charges" relating to the Abandoned Goods. (Fifth Elkhatib Aff. ¶ 7b., ECF No. 103.2.)

132. In its counterclaims, Genfine seeks recovery of the full amounts due as to the Received Goods and the Abandoned Goods along with the above-referenced incidental damages plus prejudgment and post-judgment interest.

133. Based on the evidence of record, it is undisputed that Genfine performed its obligations with regard to both the Received Goods and the Abandoned Goods. In its response to Genfine's summary judgment motion, LIU's only real argument is that the goods were non-conforming. This is so, according to LIU, because (1) any furniture LIU purchased from Genfine was subject to the exclusivity agreement; and (2) once Genfine offered LIU's models that were subject to the exclusivity agreement to other customers in the North American market, the furniture shipments were rendered non-conforming.

134. As discussed earlier in this opinion, "[t]he elements of a breach of contract claim are '(1) existence of a valid contract and (2) breach of the terms of that contract.'" *Syndicated Servs.*, 2017 NCBC LEXIS 13, at *13 (quoting *Poor*, 138 N.C. App. at 26).

135. Under North Carolina's UCC, "[r]ejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." N.C.G.S. § 25-2-602 (2021).

136.  The UCC also states as follows regarding a buyer's revocation of its prior acceptance of goods due to nonconformity:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it
>
>> (a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
>>
>> (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

*Id.* § 25-2-608.

137.  Even assuming, without deciding, that the violation of a contractual exclusivity agreement by a seller under these circumstances could render goods sent to the buyer "non-conforming" under the UCC, the most basic flaw with LIU's non-conformity argument is that the Court has now ruled as a matter of law that no enforceable exclusivity agreement existed between LIU and Genfine.  LIU has also failed to establish a genuine issue of material fact on the issue of whether the furniture was non-conforming in any other respect.  Nor has LIU offered any valid alternative argument as to why its refusal to provide payment for the Received Goods and the Abandoned Goods was justified so as to warrant the denial of summary judgment on Genfine's counterclaims.

138.  Therefore, the Court GRANTS summary judgment in Genfine's favor on its counterclaims on the issue of whether LIU is liable for breach of contract with regard to the Received Goods and the Abandoned Goods.

139. Genfine has also moved for summary judgment on the issue of damages with regard to its counterclaims. It seeks judgment in the amount of

> $484,134.35 for the price of the Received Goods and the Abandoned Goods, plus $33,174.91 in incidental damages, plus interest of $5,147.52 through May 26, 2019, plus interest of $106.11 per day from May 26, 2019 through the date of judgment, and that the judgment bear interest at the legal rate of 8%.

(Brief Supp. Summ. J. Counterclaims, at 17, ECF No. 132.)

140. LIU—despite having had a full and fair opportunity to do so in response to Genfine's motion—has failed to meaningfully challenge Genfine's calculation of damages attendant to its counterclaims. Moreover, the Court has carefully reviewed the evidence submitted by Genfine in support of its requested damages and is satisfied that they are all supported by admissible evidence.

141. The only aspect of Genfine's requested damages that remains unclear concerns its calculation of interest. As quoted above, Genfine asks for an award of interest in the amount of $5,147.52 through 26 May 2019 plus interest of $106.11 per day from 26 May 2019 through the date of judgment. However, Genfine has not clearly explained the basis for its calculation of interest in these amounts. Accordingly, Genfine is DIRECTED to submit a supplemental memorandum within twenty (20) days explaining in detail the basis for its interest calculations. LIU shall be permitted, if it wishes, to likewise submit a supplemental memorandum on this same issue within twenty (20) days.[12]

---

[12] Said memoranda shall relate *solely* to the issue of the proper calculation of interest on the amount of damages to which the Court has ruled herein that Genfine is entitled to recover on its counterclaims. Each memorandum shall be limited to 3,750 words and shall comply in all respects with Rule 7.8 of the North Carolina Business Court Rules. Genfine is also

**III. Motion to Dissolve Preliminary Injunction**

142. In their final Motion, Defendants request that the Court dissolve the preliminary injunction previously entered in this action. In addition, Defendants seek an order directing that the $100,000 bond associated with the injunction be forfeited to them.

143. Our Court of Appeals has held that "[u]nquestionably, North Carolina courts have the equitable powers to dissolve or modify, on the ground of change in circumstance[,]" an order granting a preliminary injunction. *See Poston v. Morgan*, 83 N.C. App. 295, 299–300 (1986).

144. As noted above, on 1 July 2019, the Court issued a preliminary injunction against Defendants enjoining them from (1) the sale, or offer of sale, by Defendants of any products from certain enumerated lines of furniture in the North American market; (2) selling, or offering for sale, any products in LIU's product archive, including certain enumerated furniture models, to a list of designated customers; and (3) "[s]elling or offering for sale [in the North American market] the Abandoned Products and bearing [sic] any Leather Italia marks and/or tags[,]" contained in certain enumerated shipping containers. (Order Mot. Prelim. Inj., at 22–23.)

145. With regard to the substantive claims asserted by LIU in its Amended Complaint, the Court's injunction was based entirely on its finding that "[LIU] has

directed—within the same deadline—to submit a proposed order and judgment with regard to its counterclaims. Upon receipt of the parties' memoranda, the Court will determine the need for a hearing on this issue.

shown a likelihood of success on a claim for breach of the Exclusivity Provision of the Oral Agreement[.]"  (Order Mot. Prelim. Inj., at 14.)[13]

146.  In making its early determination on the issue of whether LIU had shown a likelihood of success on the merits for purposes of its preliminary injunction motion, the Court was, of course, relying on the limited factual record before it existing at that time.  Now, however, this case is in a very different posture.  Based on the extensive discovery that has been conducted by the parties over the last several years, the factual record is much more fully developed, and the Court has now dismissed the very claim that formed the basis for the issuance of the preliminary injunction three years ago.  Therefore, that claim (LIU's breach of contract claim) can no longer serve as the basis for the continued existence of the preliminary injunction.

147.  The Court has carefully considered whether the preliminary injunction should remain in effect based on the remaining substantive claims asserted by LIU upon which the Court has denied summary judgment.[14]

148.  Although, for the reasons discussed above, the Court has found the existence of a genuine issue of material fact as to LIU's claims for UDTP, civil

---

[13] In its Preliminary Injunction Order, the Court expressly stated that it therefore did not need to address the merits of any of the other substantive claims asserted by LIU for purposes of determining whether preliminary injunctive relief was appropriate.  (Order Mot. Prelim. Inj., at 14.)

[14] At the 22 July hearing on the pending Motions, the Court expressly gave the parties the opportunity to fully state their positions on whether the preliminary injunction should remain in effect in the event the Court granted summary judgment in favor of Defendants on the issue of whether Defendants had breached the alleged exclusivity agreement.

conspiracy, and conversion, the Court is unable to conclude that LIU has shown that the preliminary injunction should remain in effect.

149. Even assuming *arguendo* that LIU has demonstrated a likelihood of success on its remaining claims, the Court is skeptical of LIU's assertion that dissolving the injunction will cause it to suffer irreparable harm. LIU has failed to convince the Court that its recovery of monetary damages in the event that it is successful on its remaining claims at trial will not be sufficient to make it whole. *See Board of Light & Water Comm'rs v. Parkwood Sanitary Dist.*, 49 N.C. App. 421, 423 (1980) ("Where there is a full, complete and adequate remedy at law, the equitable remedy of injunction will not lie.") (citations omitted), *disc rev. denied*, 301 N.C. 721 (1981); *Smith v. N.C. Motor Speedway, Inc.*, 1997 NCBC LEXIS 10, at **22 (N.C. Super. Ct. Nov. 12, 1997) (denying a motion for a preliminary injunction where "an award of money damages would provide [the injured party] full relief") (cleaned up).

150. Finally, the Court believes a balancing of the equities favors Genfine rather than LIU. Genfine has been subject to an injunction for over three years based on an alleged violation of an exclusivity agreement that the Court has now concluded is not legally enforceable.

151. Accordingly, the Court, in its discretion, hereby DISSOLVES the preliminary injunction entered on 1 July 2019.

152. However, the Court elects to DEFER a ruling on Genfine's request that the $100,000 bond previously posted by LIU as a condition to the issuance of the

injunction be forfeited to Genfine without prejudice to Genfine's ability to renew that motion after the trial of this matter.

## CONCLUSION

THEREFORE, IT IS ORDERED as follows:

1. Defendants' Motions for Summary Judgment are GRANTED as to LIU's claims for breach of contract, misappropriation of trade secrets, unjust enrichment, breach of confidence, and piercing of the corporate veil.

2. Defendants' Motions for Summary Judgment are DENIED as to LIU's claims for UDTP, conversion, and civil conspiracy.

3. Genfine's Motion for Summary Judgment on its counterclaims is GRANTED as to liability.

4. Genfine is DIRECTED to file a supplemental memorandum on the issue of the proper calculation of interest on the damages associated with its counterclaims within twenty (20) days along with a proposed order and judgment as to its counterclaims. LIU shall likewise be permitted to file a memorandum on this same issue along with a proposed order and judgment within twenty (20) days.

5. The preliminary injunction previously issued by the Court on 1 July 2019 is DISSOLVED.

6. The Court DEFERS ruling on Genfine's request that the $100,000 bond previously posted by LIU as a condition to the issuance of the preliminary injunction be forfeited to Genfine without prejudice to Genfine's ability to renew that request after the trial of this matter.

SO ORDERED, this the 5th day of December, 2022.

/s/ Mark A. Davis

Mark A. Davis
Special Superior Court Judge for
Complex Business Cases